HILL, *Appellant*, v. TAYLOR; HOEFER, *Interpleader*.

Division Two, December 4, 1894.

1. **Fraudulent Sale:** AGREEMENT TO EMPLOY VENDOR: CREDITORS. The sale of personal property by an insolvent debtor to a *bona fide* purchaser, followed by an immediate change of possession, with an agreement that the vendor should resell said property for the vendee and receive for his services in so doing the residue of the proceeds of the resale after deducting the amount of the purchase price and a certain sum as the profits of the vendee, *held* not fraudulent as to the vendor's creditors.

2. ———: INTENT: KNOWLEDGE OF VENDEE. A fraudulent intent, to render a sale of property void as to creditors, must exist at the time of the sale, and the vendee must have knowledge thereof.

3. **Evidence:** HEARSAY. Hearsay evidence is incompetent to prove one's indebtedness.

4. **Contract of Sale:** MINORITY. One not a party to a sale can not attack it on account of the vendor's minority.

5. ———: USURY. Nor can one not a party to a usurious contract attack it on that ground.

*Appeal from Saline Circuit Court.*—HON. RICHARD FIELD, Judge.

AFFIRMED.

*William Aull, E. F. Keyton* and *Boyd & Murrell,* for appellant.

(1) The court erred in refusing instruction number 5 asked by appellant. *Coburn v. Pickering*, 3 N. H. 424; *Parker v. Patte*, 4 N. H. 178; *Connelly v. Walker*, 45 Pa. St. 449; *Reed v. Pelliteer*, 28 Mo. 177; *State to use v. Tasker*, 31 Mo. 448; *Bullene v. Barrett*, 87 Mo. 189; *Passamore v. Eldridge*, 12 S. & R. (Pa.) 198; *Mfg. Co. v. Steele*, 36 Mo. App. 496; *Holmes v. Braid-*

*wood*, 82 Mo. 610; *McVeagh v. Baxter*, 82 Mo. 518; *Shelley v. Boothe*, 73 Mo. 74; *Mayberry v. Jackson*, 40 Mo. App. 136; *Bank v. Lime Co.*, 43 Mo. App. 561; *Patterson v. Letton*, 56 Mo. App. 325. (2) The court erred in refusing instruction number 6, asked by appellant. See authorities, *supra*. The bill of sale intended as a security for the money advanced and eight per cent. interest, and in addition thereto a bonus of $500, was absolutely void. Session Acts, 1891, pp. 170 and 171, secs. 1 and 2; *American Rubber Co. v. Wilson*, 55 Mo. App. 656; *Patterson v. Letton*, 56 Mo. App. 325; *Drennon v. Dalincourt*, 56 Mo. App. 128. (3) The court erred in granting instruction number 3 for respondent. Session Acts, 1891, pp. 170 and 171, secs. 2 and 3. *American Rubber Co. v. Wilson*, 55 Mo. App. 656; *Drennon v. Dalincourt*, 56 Mo. App. 128. (4) The court erred in granting instructions numbers 1 and 2, asked by respondent. It is not the law. 53 Mo. App. 23, and 56 Mo. App. 325. Appellant should have been permitted to submit the question of age and experience, together with the facts connected with the giving of the bill of sale to interpleader to the jury. It was material upon the question as to how Taylor and the interpleader prevailed upon him to make the bill of sale, and should not have been excluded. (5) The court erred in excluding evidence as to the indebtedness of Taylor. *Meyberg v. Jacobs*, 40 Mo. App. 135. (6) The evidence shows conclusively that, though an absolute bill of sale was taken, there was a secret trust and the bill of sale was intended as a security to secure usurious interest (interest and $500 bonus). The bill of sale and intended security were void. See authorities *supra*. (6) The verdict of the jury and the judgment were irregular and void. *Wilson Distillery Co. v. Hubbard*, 53 Mo. App. 23.

Hill v. Taylor.

*Wallace & Chiles* for respondent.

(1)  There was no error in the court below in' refusing to give the instructions numbers 2, 3, 4, 5, 6, 7, 8 and 9, asked by plaintiff below, appellant here, nor any one of them.  They and neither of them are applicable to the case at bar.  The cases of *Reed v. Pelliteer*, 28 Mo. 173; *State to use v. Tasker*, 31 Mo. 44; *Mfg. Co. v. State*, 36 Mo. App. 496; *Connelly v. Walker*, 45 Pa. St. 449; *Bank v. Lime Co.*, 43 Mo. App. 561; *Patterson v. Letton*, 56 Mo. App. 325, as well as *Passamore v. Eldridge*, 12 S. & R. (Pa.) 189, as well as the cases in the third and fourth N. H., and other cases cited by appellant in the same line, are cases where there were absolute bills of sale or conveyances of personal property by debtors to their creditors, with secret trusts accompanying them, by which the property, or part of it, or some interest or use of the same, was to go to the failing debtors.  There is no "secret trust" in the case at bar.  (2)  The court below did not err in giving the instructions numbers 1, 2 and 3, nor either of them, on the part of interpleader.  They are correct enunciations of the law of this case.  The objections of appellant to said instruction number 3 are fully answered in the point 1 in this brief, as well as the inapplicability of his authorities. As to what constitutes a fraudulent conveyance, see *Hausman v. Hope* (including statement of case), 20 Mo. App. 193, at 197.  "Mere suspicion is not proof. However honest may be the conviction of the existence of fraud and irregularity in the mind of a creditor, in such cases, it will not supply "the law's demand" "for tangible evidence." *Ibid.* Hoefer had no knowledge that Taylor was in debt.  *Shelly v. Boothe*, 73 Mo. 74; *Holmes v. Braidwood*, 82 Mo. 610; *Greely v. Reading*, 74 Mo. 309; *Nash v. Norment*, 5 Mo. App. 545;

*Petring v. Christler*, 90 Mo. 649. Instruction 3, approved in last case on page 656, is to same effect with interpleader's first instruction in case at bar. See, also, *Dobyns v. Meyer*, 95 Mo. 132; *McIntosh v. Smily*, 32 Mo. App. 125; s. c., 107 Mo. 379; *Markey v. Umstattd*, 53 Mo. App. 20; *Van Raalte v. Harrington*, 101 Mo. 602. (3) On the evidence, the court might well have instructed the jury to find for the interpleader. *Trimble v. Mercantile Co.*, *supra; Robinson v. Dryden, supra.* (4) J. M. Taylor never had any legal possession of the horses. *Claflin v. Rosenberg*, 42 Mo. 439; *State to use v. Donnelly*, 9 Mo. App. at 527; *Knoop v. Distilling Co.*, 26 Mo. App. at 311. (5) Plaintiff manifestly mistook his remedy, if any he had. If he had any remedy at all, it was by ordinary judgment against Taylor and the garnishment of Hoefer on execution. *Hausman v. Hope*, 20 Mo. App., *supra.*

BURGESS, J.—Plaintiff instituted this suit in the circuit court of Lafayette county, Missouri, against the defendant Taylor, and caused to be attached as his property something over two hundred and eighty-eight head of western horses. Charles Hoefer interpleaded, claiming the horses as his property. The venue of the cause was subsequently changed to Saline county, where, upon trial had to a jury, there was a verdict and judgment for the interpleader for the possession of the horses, and plaintiff appealed.

W. S. Tough, manager of the horse and mule department of the Kansas City stock yards, authorized Taylor by wire at Idaho Falls, Idaho, to draw on him at the rate of $10 per head on the horses, which Taylor bought from one Hockman, the balance to be paid when realized from sale of the stock, Taylor to ship the horses to Kansas City stock yards, and to draw on Tough for the money. Taylor bought the horses at

$3,000, and took from Hockman a receipt, which reads as follows:

"September 11, 1891.

"Received of James M. Taylor, agent, $10 on my band of two hundred and sixty-five head of horses and mares and one yearling jack and outfit; balance as agreed upon to be paid as soon as counted out.

"BRICK HOCKMAN."

Taylor then drew on Tough for $2,600, in part payment of the purchase money for the horses, cashed the draft and took from the amount realized thereupon the $10 paid to bind the contract, paid Hockman $1,800 and some time after the stock had arrived at Kansas City executed to him his own note for the sum of $1,000, with John Reed and J. H. Dooley as sureties to secure the payment of the balance of the purchase price. Tough never at any time authorized Taylor to buy the stock as his agent. Hockman delivered the stock to Taylor, and then he and Hollingshead took the horses to Idaho Falls, whence they were shipped to Kansas City. There were twelve car loads of the stock; ten car loads were shipped in the name of Hockman, and two in the name of Hollingshead, in order to get a pass for said Hollingshead east over the railroad.

The bills of lading were issued to Hockman, the draft on Tough for $2,600 was attached thereto and sent for collection by Anderson Brothers, by whom it had been cashed, to the Utah National Bank at Ogden, and by it sent to the Merchants' National Bank, Kansas City, Missouri, for collection. The horses were consigned to Anderson Brothers.

When the stock reached Kansas City stock yards, Tough refused to honor or pay the draft, but held the horses for the freight bill due the railroad, amounting

to $2,180.92; for a feed bill due the yards for $353, and until the draft for $2,600 should be paid. The. evidence was conflicting as to the ownership of the stock, whether it was Taylor's, or whether the title was to remain in Hockman until he was fully paid. Hockman claimed the stock as his until the balance of the purchase money, $1,000, due him was paid, and refused to allow them to be removed .or sold until this was done.

Hoefer, learning through a friend the condition the stock were in at Kansas City, met with Taylor at Higginsville, his place of. residence, when Taylor assured him that they could be purchased cheap, and that, if he would buy them, he, Taylor, would agree to attend to and sell them for him. Hoefer wanted to be indemnified against any loss that he might incur by reason of the investment, and, in order to induce him to buy the stock, Taylor and his wife executed to him their note for $2,750, and secured its payment by deed of trust on a house and lot of Mrs. Taylor's, in the town of Higginsville, and a couple of horses, all valued at $1,700. Taylor was to handle the horses for Hoefer for any ultimate profit there might be on the sale of them, after the amounts Hoefer had invested in them should be refunded to him, but was not to be liable for any expenses.

There was indorsed on the note, executed by Jane L. and J. M. Taylor, this memorandum: "This note is given to secure against loss on horses bought at Kansas City." The note and deed of trust were executed October 26, 1891.

Hoefer went to Kansas City on the day following and, as stated in his evidence, he purchased the stock from Hockman for the sum of $5,000, and took bill of sale therefor, paying on said purchase $5,133.92 as follows: The draft for $2,600, freight bill, $2,180.92,

and feed bill, $353.   Hockman in his testimony denied selling the stock to Hoefer; said that it did not then belong to him, and that when he signed the bill of sale, he did not know what it. was, and made it out to help Taylor.   Taylor was a party to, or agreed to, the sale of the horses to Hoefer.

Hoefer then concluded the agreement with Taylor, which they had under consideration, by which Taylor was to give his attention to the care of and selling of this stock, Hoefer to incur all expense, and after they should be sold and all amounts invested by Hoefer, and $500 as a profit to him in the transaction were repaid to him, Taylor was to have the surplus profits, if any, for his services.   And it was agreed that a note should be drawn up, payable to Chas. Hoefer, as cashier, for the amounts Hoefer had paid out, to be signed by Chas. Hoefer, and by J. M. Taylor, to be held as a memorandum when they should settle profits, and to be credited by proceeds of horses as sold.   When this note was being written, Tough asked Hoefer to include a $350 debt due him by Taylor, which was done with Taylor's assent in case the horses should bring enough after Hoefer was prepaid.   The whole amount paid out for this stock by Hoefer, and including $500 profit to him and the $350 to be paid to Tough in case the horses should bring enough after Hoefer was paid, amounted to $5,983.92.   After deducting from which the amount of the $2,750 note, executed by Jane L. and J. M. Taylor to Hoefer, cashier, left $3,234, for which a note was executed by Chas. Hoefer and J. M. Taylor to the order of Chas. Hoefer, cashier, due at four months, to which a memorandum was pinned as follows: "This note is charged on book of bank for $2,634; $350 to be paid to W. S. Tough, Mg'r of K. C. stock yards, provided the whole

am't of note is paid out of proceeds of horses this day bought of K. C. stock yards."

And on the twenty-ninth day of October, 1891, Charles Hoefer executed his individual note to the order of the Bank of Higginsville, of which he was cashier, for $2,750, due at four months, with eight per cent. interest from its date, and indorsed and delivered the $2,750 note executed to him as cashier, by Jane L. and J. M. Taylor, to said bank as "collateral security" on his said individual note to the bank for the same amount, thus making the transaction his individual matter. After paying for the horses, mares and colts, Chas. Hoefer gave his receipt to the stock yards for the same, specifying the amounts he paid therefor as aforesaid. Whereupon the stock was turned over and delivered to Hoefer with the assent of Hockman and Taylor, and transported to Lafayette county, where they were put upon pasture. Only two of the horses had been sold by Hoefer up to the time of the levy of the writ of attachment.

The note given by Taylor, Reed and Dooley to Hockman for $1,000, dated October 27, 1891, was executed after the sale of the stock to Hoefer, Hoefer having refused to pay Hockman that amount in addition to the amount of the draft, freight bill and feed bill for the stock, and refused to sign or become liable on this note, but by verbal agreement, with the assent of Taylor, agreed, that $1,000 should be paid to Hockman out of the profits on the horses, if any, when sold, to be paid next after Tough's $350 and before Taylor was to get any part of the profits in the resale of the horses. Hockman never realized anything on this note, which, when it became due, was protested for nonpayment.

The court, at the instance of plaintiff, instructed the jury as follows:

"1. The court instructs the jury that the law devolves upon the interpleader the burden of proving by a preponderance of the evidence, that he was, on the twenty-first day of November, 1891, the owner of the property in controversy, and, unless he has so proven to your reasonable satisfaction, you will find for the plaintiff."

And, on behalf of the interpleader, gave the following instructions:

"1. The only issue for the jury to determine in this action is whether or not Chas. Hoefer, the interpleader, was the owner of the property in controversy at the date of the levy of the attachment thereon in favor of Oscar E. Hill against James M. Taylor; and if the jury believe from the evidence that said interpleader was such owner at such time, the jury will find for the interpleader and return their verdict in the following form, to wit: 'We, the jury, find the issue for the interpleader, Chas. Hoefer.'

"2. The court instructs the jury that, as to whether Brick Hockman was or was not of legal age at the time of the alleged sale and execution of the bill of sale in evidence by him to the interpleader Hoefer, is immaterial as to the issue now on trial, as said Brick Hockman is not a party to this proceeding, and is not here claiming the property attached, or any of it.

"3. If the jury believes from the evidence that one Brick Hockman was in the possession and control of the property in controversy, claiming the right to sell the same; that he entered into an arrangement with J. M. Taylor by which the said property was shipped to Kansas City, a draft being drawn by the said Taylor on the manager of the Kansas City stock yards for $2,600, and attached to the bills of lading issued by the railroad company for the said stock; that the said stock, after shipping, still remained under the super-

vision and charge of said Hockman, subject to the lien created by the draft and bills of lading, and charges of freight, feed and other expenses; that whilst the said stock remained in the stock yards at Kansas City they were held for the payment of the said draft, freight and other charges; that in addition thereto the said Hockman also claimed the possession and control of the said horses; that while in this condition the interpleader, Hoefer, in good faith, paid off said draft and the railroad and stock yard charges thereon under an agreement with the said Hockman, and took from him a bill of sale for the said property; that the possession of the said stock was then turned over to him, the said Hoefer, by the said Hockman, and the manager of the stock yards, then the said Hoefer became the owner of the said property; and you will so find, even though you may further believe that an agreement existed between the said Hoefer and J. M. Taylor, that any surplus above the amount so paid by Hoefer, and certain other sums, on a sale of property, if there was any surplus, should go to the said Taylor, in payment for his services in looking after and selling said property."

There were a number of instructions asked by the plaintiff and refused, which were predicated upon the theory that, if there was a contract or agreement between Hoefer and Taylor by which Taylor was to sell the horses, and derive some benefit from such sale, such an arrangement was fraudulent and void as to the creditors of Taylor.

To this contention we are not prepared to give our assent, whether the arrangement was secret or otherwise. Nor is it sustained by any of the authorities cited by plaintiff in support thereof.

In the case at bar the sale was unconditional, at a fair price, for cash, followed by a transfer of the possession of the property, immediately after the purchase,

to the purchaser, and it makes no difference whether it was sold by Hockman or Taylor, or both, and this even though Taylor's purpose and intention in selling the property may have been to delay, or defraud his creditors, as there was no evidence tending to show that the interpleader had knowledge of any such fraudulent purpose on the part of Taylor, even if such · purpose existed, or that he had any knowledge that Taylor was in debt or insolvent. He seems to have purchased the property at the request of Taylor, it is true, but on speculation, as, by the terms of his contract with Taylor, the money laid out by him was to be refunded to him together with a bonus of $500, and then Tough was to be paid $350 owing him by Taylor, and Hockman $1,000 remaining due him on the purchase price for the horses which were sold by him, before Taylor was to receive anything for his services in handling and selling the horses after they were purchased by Hoefer. Taylor had no interest whatever in the property after it had been sold to Hoefer, who had paid a fair price and had taken possession and absolute control of it, and there was nothing to prevent the employment of Taylor to render services in and about the property in the same manner and for the same purpose as any other agent or employee. *Claflin v. Rosenberg*, 42 Mo. 439; *Burgert v. Borchert*, 59 Mo. 80.

Not only this, Taylor's object in disposing of the stock seems to have been to protect the draft for $2,600, which he had drawn on Tough, and to pay the freight and feed bills for which the stock were held, so that they might be removed from the stock pens where the expense of their keeping was rapidly absorbing their value. And to do this it was necessary that he procure some person to buy them, and at his request Hoefer did so, and in so doing was guilty, from what appears from the record, of no wrongdoing. While Taylor's conduct

in buying the stock as agent without saying for whom, but ostensibly for Tough, who denied his authority to do so, and repudiated his actions in that regard, then shipping them in the name of Hockman and Hollingshead, under consignment to Allen Brothers, tended strongly to show that his object in so doing was to defraud his creditors, it was not shown that the interpleader had any notice of those facts at the time of his purchase, and, at the time of the sale to Hoefer, Taylor seems to have had an entirely different object in view, which was to protect the draft, pay the freight and feed bills as hereinbefore stated. But it is not sufficient that there was a suspicion of a fraudulent intent on the part of Taylor to defraud his creditors at the time he purchased and shipped the horses from Idaho Falls. It must have been shown to have existed at the time of the sale to Hoefer, and that Hoefer had knowledge thereof. *Dougherty v. Cooper*, 77 Mo. 528; *Garesche v. MacDonald* 103 Mo. 1; *Frederick v. Allgaier*, 88 Mo. 601.

We think the court committed no error in sustaining the objections to the evidence in regard to Taylor's indebtedness in Idaho, upon the ground that the information solicited thereby was mere hearsay. Had it been proposed to show his indebtedness by some person who had personal knowledge thereof, the objection would not in all probability have been made, and if made would have doubtless been overruled.

It is difficult to perceive how the provisions of sections 1 and 2, pp. 170, 171, Session Acts of 1891, can be invoked in behalf of plaintiff in this case. They have reference alone to "interest" and "usury" and could in no way affect the contract or agreement between Taylor and Hoefer, so far as the plaintiff is concerned. In other words, plaintiff being no party to the contract between Taylor and Hoefer, and being a purchaser for value and not a pledgee or mortgagee,

the statute does not apply as to him, and Taylor is not complaining.

For the same reason the age of Hockman was immaterial; for, although he may have been under age at the time of the sale of the horses to Taylor and the execution of the bill of sale to Hoefer, he is no party to this suit, and is not seeking to avoid either contract on account of his minority, and no one else can do so for him. The instructions that were given presented the case fairly to the jury, the judgment is clearly for the right party, and should be affirmed. It is so ordered. All of this division concur.